Argued November 7, affirmed December 12, 1962

## CATHCART v. CATHCART

376 P. 2d 665

*Otto R. Skopil, Jr.,* Salem, argued the cause for appellant. With him on the brief were Williams & Skopil and Al J. Laue, Salem.

*John D. Thomas,* Corvallis, argued the cause for respondent. On the brief were Huston, Thomas & Johnson, Corvallis.

Before McAllister, Chief Justice, and Rossman, Perry, Goodwin and Denecke, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Joy Cathcart, from that part of a divorce decree which awarded to the defendant (father) the custody of the child born to them. Only the part of the decree which pertains to the custody of the child is in issue upon appeal. The divorce was awarded to the father, but that feature of the decree, as just indicated, is not challenged on appeal. The provisions of the decree concerning the custody of the child follow:

> "The defendant be awarded the care, custody and control of the minor child of the parties, to-wit: Michael Marks Cathcart, subject only to the right of the plaintiff to visit said child at reasonable and seasonable times and places."

It also provided that the child should not be taken from the state without the consent of the court. Those details are not in issue. The plaintiff, that is, the mother, in appealing, contends that she and not the defendant should have been awarded the child's custody. The child is a boy, nine years of age on February 14, 1962.

The contention that the plaintiff was entitled to the custody of the boy constitutes the first assignment of error. The plaintiff presents a second assignment of error which reads:

> "The trial court erred in refusing plaintiff's counsel to question the defendant relative to the possibility of a reconciliation."

We have read the typewritten transcript of all of the evidence which was submitted to the trial judge during the trial. It covers 664 pages and is ac-

companied with exhibits. It tells the story of the married lives of these two people and reveals the attention which they gave their son. They lived near Alsea. The trial judge, immediately before he awarded the divorce to the defendant (father) stated:

"* * * Well, here are two young people who have made a mess of themselves. There is just no question about it. They had the opportunity with the help that they had from Mrs. Cathcart's family to have made a wonderful success over there in the valley. They were given property, cattle, horses and had clothing furnished for Mrs. Cathcart and probably the little boy and it all ends up in this mess. It is a shame. I feel very sorry for Mrs. Marks * * * but she has been too good. She's been too good to these people * * *."

Mrs. Marks is the plaintiff's mother. The plaintiff's father died about three years before the trial. At the close of a comprehensive review of the evidence which the trial judge made immediately before he awarded the divorce to the defendant, he recessed the proceeding until he could come to a decision concerning the custody of the boy.

The boy, whose first name is Michael, had lived with his parents until about two months prior to the trial of the divorce suit. Then he moved into his grandmother's home. The parents' home was about a quarter of a mile from that of the grandmother. The latter displayed a wholesome interest in the little fellow; and the favorable comment which the witnesses who referred to the boy made concerning his health, friendliness, politeness and neat appearance was due in part to the attention which the grandmother gave to him. However, both the plaintiff and the defendant were mindful of their son. Several of the witnesses

thought that the defendant, especially, was observant of the boy's welfare. A few days after the trial judge had recessed this suit for the purpose of reaching a decision as to the future custody of the boy he reconvened his court and thereupon more testimony was presented. The first of it came from two witnesses called by the defendant. Then plaintiff's counsel called the defendant as a witness and inquired of him concerning his attitude toward the re-establishment of the home and a reconciliation of the parties. No announcement was made as to the plaintiff's position upon those subjects. When defendant's counsel objected to the inquiry, the trial judge stated: "I don't see how that would be relevant to any issue here," but did not sustain the objection. Thereupon, another question was propounded and plaintiff's counsel declared, "Mr. Finklea is not out there any longer." The individual just mentioned, Finklea, was, according to the defendant, the cause of the break-up of the home and the marriage. Finklea had lived in the home of the plaintiff and the defendant upon coming to Oregon. Some months previously he had obtained in a questionable manner some money from Mrs. Marks which he had been unable to restore to her. Then he was located in Louisiana and under pressure came to Alsea to work out his debt. He thereupon made his home in that of the plaintiff and the defendant. He was a horse trainer. Mrs. Marks was continuing the business that her husband had established as a breeder of horses and cattle. Investigation conducted by the defendant revealed a week or so before the trial that Finklea had a considerable criminal record. Some days before the trial judge reached his final decision, Mrs. Marks ordered Finklea off of her property. With the disruption of the marriage between the plaintiff and the

defendant, Finklea had moved into an apartment owned by Mrs. Marks. When Finklea packed his belongings the plaintiff came to his apartment and helped him. When he finally departed he took with him some of Mrs. Mark's property; and a deputy sheriff, summoned by Mrs. Marks, was compelled to bring him back so the property would be restored. After he had given back the property Finklea returned once more—this time to give testimony in this case. After all of those developments had occurred plaintiff's counsel made the statement to the defendant that we have quoted, that is, "Mr. Finklea is not out there any longer." At that point the defendant inquired, "What guarantee would I have that he won't be back?" The reply that he received was, "I don't know what guarantee you would have."

ORS 107.100 (1) directs:

"Whenever a marriage is declared void or dissolved, the court has power further to decree as follows:

"(a) For the future care and custody of the minor children of the marriage as it may deem just and proper. In determining custody the court shall consider the best interests of the child and the past conduct and demonstrated moral standards of each of the parties. No preference in custody shall be given to the mother over the father for the sole reason that she is the mother."

It is evident that the trial judge did not believe that the boy should be brought into further contact with Finklea. The latter, at the plaintiff's request, had taken the boy to school repeatedly, had helped him with his school work and had been his companion when the boy returned from school. In fact, he had almost become a member of the family group. In

recent months he had virtually displaced the defendant. In view of Finklea's criminal record and his destruction of the marriage bonds between the plaintiff and the defendant, the trial judge was undoubtedly right in demanding that no further association should occur between the boy and Finklea. It will be recalled that even after the plaintiff's mother demanded that Finklea leave her property he held her daughter in such singular fascination that she tenderly packed his belongings for him.

The defendant has arranged for himself and Michael to live in the home of his brother and sister-in-law. Those relatives have a boy the same age as Michael. The defendant's sister-in-law is a registered nurse who has displayed an interest in the school attended by her son and in boys' organizations. As a witness she testified that she was willing to assume the responsibility implied in providing a home for her nephew and her brother-in-law.

■ It is impossible to provide a satisfactory substitute for a disrupted home which at one time brought happiness to a child. In all likelihood, the new home for this little boy will not be the equal of that which he had in the past, but neighbors and friends who had known the defendant for many years spoke well of him as a father. Without analyzing the testimony further, we acquiesce in the decision reached by the trial judge and affirm the part of the decree which awarded the custody of the boy to the defendant. Some men who have passed through a bitter episode similar to that from which the defendant is emerging have faced their new responsibilities with increased earnestness. We assume that the defendant will do so.

■ The record does not indicate that the trial judge was unwilling to support efforts for reconciliation

that gave hope of success. It is apparent that he could perceive no prospect for reconciliation in the effort which the plaintiff was making at converting the witness stand into a trysting place. It will be recalled that by the time the plaintiff made her effort (1) the trial judge had already announced that he would grant the divorce to the defendant, (2) the plaintiff's mother had ordered Finklea off of her property, (3) Finklea's criminal record had become known, and (4) notwithstanding these facts the plaintiff called upon Finklea and helped him with his packing. When he departed he took with him, as we have said, property of Mrs. Marks of great value. A deputy sheriff was the means whereby the property was returned.

We do not believe that this assignment of error reveals any error upon the trial judge's part. It is plainly evident that he disliked to see a marriage disrupted but that he could discern no prospects for this one's resumption.

The decree of the circuit court is affirmed.